UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
MICHAEL ASSUE,

                                        Plaintiff,

                                                                    **OPINION AND ORDER**

                        - against -
                                                                    No. 16-CV-7629 (CS)

UPS, INC.,

                                        Defendant.
--------------------------------------------------------------------x

Appearances:
Michael Sussman
Sussman & Associates
Goshen, New York
*Counsel for Plaintiff*

Daniel L. Schwartz
Anna Matsuo
Day Pitney LLP
Stamford, Connecticut
*Counsel for Defendant*

Seibel, J.

        Before the Court is Defendant UPS, Inc.'s Motion for Summary Judgment.  (Doc 25.)

For the following reasons, the Motion is GRANTED.

I.      **BACKGROUND**

        The following facts, which are based on the parties' Local Rule 56.1 statements and

supporting materials, are undisputed unless otherwise noted.[1]

---

[1] Defendant followed Rule 2.C.ii of my Individual Practices (limiting Local Rule 56.1 Statements to 25 pages absent permission for a longer statement), and its 56.1 Statement is 18 double-spaced pages.  (Doc. 28 ("D's 56.1 Stmt.").) Plaintiff's response of 34 double-spaced pages is appropriate. (Doc. 31 ("P's 56.1 Stmt. & Resp.") at 1-34.)  But Plaintiff then added 21 double-spaced pages of additional facts.  (*Id.* at 34-55.)  The Local Rule allows for a counter-statement of "additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b).  But Plaintiff's counter-statement consists of far more than a list such facts; it is a lengthy narrative of seemingly every event he regards as relevant to his claims.  Plaintiff made no effort to confine the statement to material facts in dispute.  Further, given that the Local Rule requires the counter-statement to be "short

1

## A. Plaintiff's Commencement of Employment with UPS

Plaintiff, who is from Trinidad and has a dark complexion, (Doc. 32 ("P's Aff.") ¶ 2), applied for a position with UPS in January 2011, (D's 56.1 Stmt. Ex. 2; Doc. 34 ("Sussman Aff") Ex. 1 ("P's Depo.") at 21:1-6.)[2] Before applying to UPS, Plaintiff had only two prior jobs that entailed working with computers, and computer work took up at most two percent of his time at both jobs. (P's 56.1 Stmt & Resp. ¶ 3.) He had received certification in computer repairs and networking. (P's Depo. at 8:9-9:2.) He also completed a six-month Microsoft-certified engineer course. (P's Aff. ¶ 3.)

Plaintiff interviewed with Mauricio Pazmino and Peter Falconer, (P's Depo. at 21:7-11), before interviewing with Chris Raffetto and Carlos Diaz, (*see id.* at 30:8-12). Pazmino was the Technology Support Group ("TSG") manager, and he oversaw UPS facilities in the New York metropolitan area. (Sussman Aff. Ex. 2 ("Falconer Depo.") at 10:20-25, 11:12-12:6; *see* P's Depo. at 23:9-16.) Falconer was a TSG supervisor who reported to Pazmino and supervised technicians in the "northern buildings," which included UPS facilities in Westchester and the Bronx. (Falconer Depo. at 10:5-25, 12:7-9, 15:9-16; Sussman Aff. Ex. 3 ("Diaz Depo.") at 31:24-35:12.) Raffetto was the TSG supervisor for the UPS facility at 43rd Street in Manhattan (the "43rd Street Facility") and Diaz was the project coordinator there. (Diaz Depo. at 34:25-35:10; *see* P's 56.1 Stmt & Resp. ¶¶ 7, 8.)

---

and concise" and that I require the moving party's Local Rule 56.1 statement to be 25 pages or less, it is not reasonable for an attorney to think that his or her "short" counter-statement should approach that length. Yet Plaintiff submitted 21 double-spaced pages. Plaintiff's counsel must adhere to the Local Rules and my Individual Practices in the future. I will consider Plaintiff's counterstatement to the extent it consists of facts as to which there is a dispute for trial or otherwise relates to Defendant's statement of undisputed facts.

[2] Plaintiff contends in his affidavit that the job placement officer at his school submitted his resume to UPS. (P's Aff. ¶ 2.) But his affidavit contradicts his deposition testimony on this point; he testified that he "saw an application on-line and . . . applied for it." (P's Depo. at 21:2-3.)

Plaintiff was hired as a temporary employee on January 31, 2011. (P's 56.1 Stmt & Resp. ¶ 7; *see* P's Depo. at 21:12-17.) The parties dispute whether Diaz played a role in hiring Plaintiff. (*See* P's 56.1 Stmt & Resp. ¶ 6.) Plaintiff testified that he does not know who decided to hire him, (P's Depo. at 29:3-5), but he assumed his hiring needed the approval of his interviewers, (*id.* at 32:6-11). Falconer testified that he and Pazmino decided to hire Plaintiff, (Falconer Depo. at 18:5-6), and no other manager had input in that decision, (*id.* at 19:7-13). Moreover, Diaz testified that he played no role in hiring technicians in the northern buildings, which is where Plaintiff was assigned after training. (Diaz Depo. at 33:1-5; *see* P's 56.1 Stmt & Resp. ¶ 9.)

Plaintiff trained with other technicians at the 43rd Street Facility. (P's 56.1 Stmt & Resp. ¶ 7; *see id.* ¶ 8.)[3] Raffetto was Plaintiff's supervisor for about three months, and he completed Plaintiff's early performance assessments. (*Id.* ¶ 8.) After training, Plaintiff was assigned to a UPS facility in Elmsford, New York and reported to Falconer for about two and a half years. (*Id.* ¶¶ 8, 9.)

### B. Plaintiff's Technician Training

Plaintiff received a training guide titled "Structured On-the-Job Training," which was provided to him in sections during the course of his first year. (P's Depo. at 32:12-33:4, 35:2-35:20; *see* D's 56.1 Stmt. Ex. 7.) The training guide was "designed to accommodate the unique training needs of each technician . . . and the needs of each individual work area." (D's 56.1

---

[3] TSG technicians are responsible for, among other things: moving, installing, replacing, and testing computer and telecommunications equipment; performing software installations and program updates; troubleshooting on UPS computer systems; providing support for internal and external users of UPS systems; and training users in UPS supported software and hardware. (D's 56.1 Stmt. Ex. 6 at UPS2; *see* P's 56.1 Stmt & Resp. ¶ 10.) Plaintiff initially worked with internal customers, meaning he would help employees in UPS facilities and make sure the equipment in those facilities was functioning properly. (P's Depo. at 25:6-26:9.) Plaintiff later worked with external customers, providing assistance so that they could communicate with UPS to meet their shipping needs. (*Id.* at 27:12-28:20.)

Stmt. Ex. 7 at UPS513 (emphasis omitted).) Pursuant to the training guide, Plaintiff received training in, among other things, TSG procedures and policies, TSG Skills Management System, time management and organization, compliance with service legal agreements and guidelines, and supporting and maintaining the UPS Network, and he received an overview of the relevant hardware, operating systems, software, and applications used at UPS. (P's 56.1 Stmt & Resp. ¶ 14.) Plaintiff signed acknowledgements affirming that he had received each training. (*Id.*) According to Plaintiff, the trainings described in the guide familiarized him "with procedures that [UPS] ha[d] and how to document and . . . do things," but he would not characterize his training as "technical training," nor would he say that the training familiarized him with "UPS servers[,] . . . networks[,] and computer systems." (P's Depo. at 36:1-10.)

Plaintiff also received informal training by contacting other technicians and asking for assistance. (P's 56.1 Stmt & Resp. ¶ 16; P's Depo. at 38:7-22.)[4] Plaintiff described some of the technicians as helpful, while others were not. (P's Depo. at 38:15-22.) He also received computer-based training through training modules, and some of the modules increased his knowledge of UPS's computer systems and their use. (*Id.* at 44:6-17.) But according to Plaintiff, information in the training modules was outdated or sometimes unavailable, and Raffetto agreed. (P's Aff. ¶ 3.) Plaintiff also contends that he complained to Raffetto about the lack of "hands-on training." (*See id.*) Specifically, Plaintiff claims he "never received a specific training plan" and "was never paired with [an] experienced senior technician for a sustained period of time." (*Id.*) At his deposition, however, Plaintiff admitted that he was not aware of

---

[4] Plaintiff also testified that after his 2012 appraisal, Falconer arranged for Plaintiff to contact two other technicians for additional assistance with "new features." (*See* P's Depo. at 84:18-86:19.)

any additional training courses that he could take and nobody ever denied his request for additional training.  (P's Depo. at 44:18-23.)[5]

### C.    Plaintiff's Performance as a Temporary Employee

Plaintiff received three "new employee appraisals" during his training, (D's 56.1 Stmt. Exs. 9-11), all of which were completed by Raffetto, (*see* P's 56.1 Stmt & Resp. ¶ 8).  In the first, dated March 8, 2011, he received a "does not meet expectations" rating in three of the areas and "meets expectations" or "nearly meets expectations" in the remaining areas.  (*Id.* ¶ 18; D's 56.1 Stmt. Ex. 9.)  Raffetto noted his dissatisfaction with Plaintiff's base skill set – which prevented him from timely completing tasks – and expressed concerned about Plaintiff's troubleshooting skills.  (P's 56.1 Stmt & Resp. ¶ 18; D's 56.1 Stmt. Ex. 9.)  Raffetto also commented that "[Plaintiff] need[ed] to show significant improvements . . . ASAP before [they] c[ould] progress with training him on UPS specific systems."  (P's 56.1 Stmt & Resp. ¶ 18; D's 56.1 Stmt. Ex. 9.)

In his second new employee appraisal on April 18, 2011, Plaintiff received "meets expectations" or "nearly meets expectations" in all of the areas.  (P's 56.1 Stmt & Resp. ¶ 19; D's 56.1 Stmt. Ex. 10.)  Raffetto commented that Plaintiff's troubleshooting skills were improving, but he was "still not at the level [Raffetto was] totally comfortable with."  (D's 56.1 Stmt. Ex. 10.)

In his third new employee appraisal on June 1, 2011, Plaintiff received "meets expectations" or "nearly meets expectations" in all of the areas.  (P's 56.1 Stmt & Resp. ¶ 20; D's 56.1 Stmt. Ex. 11.)  Raffetto observed that Plaintiff was improving "at a slower pace" than

---

[5] In a memorandum dated March 16, 2011, Plaintiff indicated to Pazmino that he was trained in, among other things, rebuilding computers, both internally and externally, troubleshooting computers and related equipment, and installing printers.  (D's 56.1 Stmt. Ex. 8.)  The memorandum does not indicate when Plaintiff received this training, but he contends that it was not from UPS.  (P's Aff. ¶ 3.)

expected. (D's 56.1 Stmt. Ex. 11.) Raffetto also noted a concern about the quality of Plaintiff's "short, clipped" communications. (*Id.*)

On June 2, 2011, Pazmino met with Plaintiff regarding his performance. (P's 56.1 Stmt. & Resp. ¶ 21.) Following the meeting, Pazmino asked Plaintiff to email him a summary of the meeting. (P's Depo. at 64:20-65:16; *see* D's 56.1 Stmt. Ex. 12.) The summary contained a number of items that Plaintiff understood to be areas where he needed to improve: "show[ing] more initiative"; "[t]ak[ing] ownership of service orders/projects"; "[f]ind[ing] resource[s] to provide information"; "[a]pproaching other[s] to get assistance"; "[i]mprov[ing] . . . technical skills in the UPS systems and [Windows]"; and "[p]rovid[ing] more detail[ed] information in . . . recaps and reports to give the reader a clear idea for what was done." (D's 56.1 Stmt. Ex. 12; P's Depo. at 65:14-16.)

On June 24, 2011, Pazmino and Falconer met with Plaintiff to discuss his performance. (P's 56.1 Stmt. & Resp. ¶ 22; *see* D's 56.1 Stmt. Ex. 13.) Plaintiff acknowledged that he needed to improve his skills with various technical systems, software, and hardware, including Windows and certain UPS-specific systems. (*See* P's 56.1 Stmt. & Resp. ¶ 22; D's 56.1 Stmt. Ex. 13.)

In his performance appraisal for the first half of 2011, conducted by Falconer, Plaintiff received a score of 65.73, which amounted to a rating of "needs improvement." (P's 56.1 Stmt. & Resp. ¶ 23; D's 56.1 Stmt. Ex. 14 at UPS576-77, 579.) He received an average score of 3.36 (on a five-point scale) in the category "critical skills," which meant he "me[t] nearly all expectations. (D's 56.1 Stmt. Ex. 14 at UPS579-80.)

In an email to Pazmino dated June 28, 2011, Falconer observed that Plaintiff had a good work ethic and was "striving to learn and develop." (*See* D's 56.1 Stmt. Ex. 15.) But he also noted his concerns about Plaintiff's lack of "external [customer] experience, which is critical to

[UPS's] business" and his lack of "real world professional technical experience" which had the potential to stymie his development.  (*See id.*)  But ten days later, in an email dated July 8, 2011, Falconer told Pazmino that he decided to keep Plaintiff as a TSG technician, noting that he "needs more work" but is "learning enough" to "develop."  (D's 56.1 Stmt. Ex. 16.)

### D.    Plaintiff as a Full-Time Employee Under Falconer

For the second half of 2011, Plaintiff received an overall score of 78.19 and an average critical skills score of 3.32; both scores meant he "me[t] nearly all expectations."  (D's 56.1 Stmt. Ex. 14 at UPS576, 578-80; *see* P's Depo. at 78:5-16.)

Plaintiff received overall scores of 91.04 and 89.35 on his performance appraisals in 2012, which meant he exceeded expectations and met all expectations, respectively.  (D's 56.1 Stmt. Ex. 17 at UPS582-85.)  He received average scores of 3.08 and 3.16 in critical skills, meaning he met nearly all expectations.  (*Id.* at UPS585-86.)  According to Plaintiff, Falconer believed Plaintiff's critical skills scores declined because he had more responsibility and had to understand and work with new systems.  (P's Depo. at 85:13-20.)

The performance appraisal for the first half of 2012 noted that Plaintiff "still [made] mistakes which cause[d] the PQI exception."  (D's 56.1 Stmt. Ex. 17 at UPS587.)[6]  Plaintiff testified that that comment referred to instances where he missed clock-ins or would not close a log properly and another instance where he failed to stock equipment properly.  (P's Depo. at 87:7-14.)  The appraisal for the second half of 2012 noted that Plaintiff "still struggle[d] with PQI."  (D's 56.1 Stmt. Ex. 17 at UPS587.)  After the second-half appraisal, Plaintiff was ranked twenty-ninth out of forty-plus technicians in his group.  (*See id.*; P's Depo. at 87:23-88:18.) With respect to external work, Plaintiff received the following comment:  Plaintiff "[n]eeds more

---

[6] PQI refers to "performance quality index."  (P's Depo. at 87:15-16.)

exposure and training. [Two] years in and low confidence is not good. [Plaintiff] [n]eeds major self training and guidance." (D's 56.1 Stmt. Ex. 17 at UPS587.) Plaintiff believed the 2011 and 2012 performance evaluations were fair. (P's Depo. at 82:6-8, 84:18-85:6.)

Plaintiff was subject to three "write-ups" for performance issues in early 2013. (*See* D's 56.1 Stmt. Exs. 18, 19, 20.) The first write-up, dated March 4, 2013, was due to an incorrect closure of "PMT," or, as Plaintiff put it, for not "follow[ing] [a certain] procedure and [not] complete[ing] [a] task before closing [a] log." (P's Depo. at 90:11-12; *see* D's 56.1 Stmt. Ex. 19.) The second write-up, dated March 5, 2013, was for not completing a special assignment by the deadline. (P's Depo. at 91:10-92:1; *see* D's 56.1 Stmt. Ex. 20.) Plaintiff requested an extension because he was occupied with another assignment that he thought was a higher priority, but Diaz denied his request. (*See* D's 56.1 Stmt. Ex. 20.) The reason for the third write-up, dated March 13, 2013, was Plaintiff's "less than satisfactory performance over the past few weeks." (D's 56.1 Stmt. Ex. 18.) In the third write-up Plaintiff acknowledged that he had "to spend more time training [him]self," and that to prevent similar problems from happening in the future, he needed to "improv[e] [his] knowledge in both internal and external systems and focus[] on completing [his special assignments] on time." (*Id.*) All three write-ups concluded with an acknowledgement from Plaintiff that if he did not "correct [his] behavior, further disciplinary actions w[ould] be taken, up to and including discharge." (D's 56.1 Stmt. Exs. 18, 19, 20.) Plaintiff claimed that that statement was "preprinted" on the form, but he read it and understood it each time before signing his name. (P's Depo. at 95:4-23.)

Plaintiff received a score of 86.4 on his performance appraisal for the first-half of 2013, meaning he met all expectations. (D's 56.1 Stmt. Ex. 22 at UPS588-89, 591.) Falconer was still Plaintiff's supervisor at that time. (*Id.* at UPS588.) Diaz, who is Hispanic, (*see* Diaz Depo. at

160:21-161:17), became Plaintiff's supervisor in the second half of 2013, (P's Depo. 96:7-9; *see* D's 56.1 Stmt. Ex. 22 at UPS588; Sussman Aff. Ex. 4 ("Frey Depo.") at 28:3-15).

     **E.**    **Plaintiff's Performance Under Diaz**

Plaintiff received a score of 61.58 on his performance appraisal for the second half of 2013, which meant he needed improvement. (D's 56.1 Stmt. Ex. 22 at UPS588, 590-91.) Defendant contends that Diaz's comments further indicate Plaintiff's poor performance; Plaintiff contends that Diaz's comments were exaggerations or inaccurate. (*See* P's 56.1 Stmt. & Resp. ¶ 32, 33.)

In or about February 2014, Diaz – believing that Plaintiff did not have the skill set to support two buildings – transferred Plaintiff to the 43rd Street Facility. (P's Depo. at 113:2-10; Diaz Depo. at 44:2-45:15.) Up until that point, Plaintiff was mostly an internal technician. (P's Aff. ¶ 2; P's Depo. at 25:6-9, 113:2-6.) Plaintiff became primarily an external technician at the 43rd Street Facility. (Diaz Depo. at 50:5-19; P's Depo. at 113:14-114:1.)

Plaintiff claims that after this transfer, Diaz took his laptop, making Plaintiff the only external technician who did not have a work-issued laptop. (*See* P's Depo. at 114:10-24.) Plaintiff complained to Vinnie Frey, Diaz's supervisor, but he did not help. (*Id.* at 115:12-116:6.) Michelle Lawrence, Karaam King, and Erroll Scott – all of whom were Black technicians in Diaz's group – had work-issued laptops. (*Id.* at 116:10-14, 210:3-7.) The only other technician who did not have a work-issued laptop was a Hispanic technician, Roberto Martinez. (*Id.* at 210:8-15.)

At some point, Diaz wrote a memorandum detailing the areas where Plaintiff needed to improve, and on April 30, 2014, Diaz and Frey met with Plaintiff to discuss the memorandum. (P's Depo. at 103:7:-105:5; D's 56.1 Stmt. Ex. 23.) Plaintiff explained to Diaz and Frey that a

number of the criticisms in the memorandum were inaccurate.  (*See* P's Depo. at 105:6-123:22.)
By email dated June 26, 2014, Plaintiff told Diaz and Frey that he had read and understood the
memorandum.  (D's 56.1 Stmt. Ex. 24.)

In June 2014, Diaz received an email indicating that Plaintiff did not complete an
assignment for a customer.  (D's 56.1 Stmt. Ex. 25 at UPS148; Diaz Depo. at 75:4-17.)  Plaintiff
told Diaz that the assignment was complete when he left the customer.  (*See* D's 56.1 Stmt. Ex.
25 at UPS147; Diaz Depo. at 75:14-17; P's Depo. at 179:17-180:2.)  Diaz could not determine
whether to believe the customer or Plaintiff.  (Diaz Depo. at 75:18-76:4.)[7]

In July 2014, Diaz received a request for assistance from another UPS employee
regarding another customer.  (D's 56.1 Stmt. Ex. 26 at UPS216-17; P's Depo. at 180:20-181:3;
*see* Diaz Depo. at 78:2-7.)  According to the notes section of the request, the customer requested
that TSG not send the "previous tech[nician] because the shipping system was not working
properly after he left."  (D's 56.1 Stmt. Ex. 26 at UPS217 (emphasis omitted).)  The previous
technician was Plaintiff.  (P's Depo. at 181:8-182:3.)  It is unclear from the email exchange what,
if anything, Plaintiff did that caused the shipping system to not work properly.

In August 2014, Diaz received an email with notes from another UPS employee
concerning another customer complaint.  (D's 56.1 Stmt. Ex. 27.)  According to the notes, the
customer said that after a UPS technician – again, Plaintiff – installed the software, the batch
import was not working.  (*Id.*; *see* P's Depo. at 183:2-184:13.)  Plaintiff testified at his deposition
that he "set up a batch import for [the customer] and it messed up, so [he] had to go back [to the
customer] and redo the [assignment]."  (P's Depo. at 184:11-13.)

---

[7] Diaz testified that Plaintiff "sa[id] it wasn't done," but that appears to be a misstatement in light of the context.
(Diaz Depo. at 75:18-76:4.)

Also in August 2014, Diaz received notification of another customer complaint. (D's 56.1 Stmt. Ex. 28.) The message from the customer read:

> Since [Plaintiff] came on Thursday the mapping is messed up.. Im [sic] flipping out.. Now my assistant has to go [i]nto every order manually from Thursday and Friday and enter in the shipping cost to our in house program.. I don't know what he did.. [H]e is saying he didn't do anything, but he for sure did . . . [be]cause my IT guy isn't even in the US to touch my system[.]

(*Id.* at UPS239.) Plaintiff denies that he was to blame for that situation. (*See* P's Depo. at 185:1-15.)

On October 17, 2014, Diaz met with Plaintiff to discuss his performance. (D's 56.1 Stmt. Ex. 29 at UPS365.) In their discussion, they reviewed various emails that "showed [Plaintiff] examples of his continued poor performance." (*Id.*) Diaz sent Frey a memorandum notifying him of the October 17 meeting and the emails that he and Plaintiff reviewed. (D's 56.1 Stmt. Ex. 29.) Diaz told Frey that Plaintiff was not "meet[ing] . . . the standards of a Technician in the [TSG]." (*Id.* at UPS365.) Plaintiff contends that Diaz's comments were unfair and attributes them to a complaint he lodged against Diaz in or about May 2014. (P's Depo. at 131:22-132:16; *see* P's Aff. ¶ 5.)[8] Based on Diaz's memorandum, Plaintiff concluded that Diaz was "nitpicking every aspect of [his] performance, and [Diaz] was using that to get [him] dismissed." (P's Depo. at 131:11-14.)

On November 24, 2014, Plaintiff and Diaz met again to discuss issues with Plaintiff's performance. (D's 56.1 Stmt. Ex. 30.) Plaintiff claims that the memorandum memorializing the meeting contains fabrications, but he does not specify what those fabrications are. (P's 56.1 & Resp. ¶ 41.)

---

[8] Plaintiff called a UPS employee helpline complaining that Diaz was "abusive and sabotaging [Plaintiff's] chances of success." (P's Aff. ¶ 5.)

On or about December 12, 2014, Plaintiff met with Diaz and Frey to discuss his performance issues.  (*Id.* ¶ 42; *see* D's 56.1 Stmt. Ex. 31.)  Plaintiff summarized in a memorandum the topics that they discussed at the meeting.  (D's 56.1 Stmt. Ex. 31.)  Frey and Diaz raised issues at that meeting that had been brought to Plaintiff's attention in April 2014.  (P's Depo. at 138:23-139:4.)

Plaintiff's mid-year and year-end evaluation scores for 2014, 0.36 and 0.12, earned him the rating "significant improvement needed."  (D's 56.1 Stmt. Ex. 32 at UPS595.)  Diaz commented that:

> [Plaintiff] needs significant improvement in all aspects of his job responsibilities.  His lack of technical proficiency affects all the BSC goals set for the year and affects the group's performance as well.  [Plaintiff] has been spoken to several times throughout the year regarding his performance and it has yet to improve.

(P's 56.1 & Resp. ¶ 44 (internal quotation marks omitted); *see* D's 56.1 Stmt. Ex. 32 at UPS596.)  Plaintiff believed his performance had improved over the course of 2014, and he noted that in the space provided for employee comments.  (D's 56.1 Stmt. Ex. 32 at UPS596.)

Plaintiff scored a 0.46 on his 2015 mid-year evaluation, and that earned the rating "significant improvement needed."  (D's 56.1 Stmt. Ex. 33 at UPS604.)  Plaintiff disputed the appraisal, writing on the last page that it was "not a true reflection of [his] performance."  (*Id.* at UPS605.)

On November 10, 2015, Diaz completed an on job observation ("OJO") of Plaintiff.  (P's 56.1 & Resp. ¶ 46; *see* D's 56.1 Stmt. Ex. 34.)  In a memorandum summarizing his observations, Diaz noted, among other things, that Plaintiff's lack of proficiency with UPS's main application caused him to lose a client's information.  (D's 56.1 Stmt. Ex. 34 ¶ 6.)  This was the only memorandum that Diaz prepared after an OJO in 2015.  (Diaz Depo. at 128:12-129:5.)  Plaintiff told Diaz that parts of the memorandum were inaccurate.  (P's Depo. at 146:2-155:24.)  For

example, Diaz criticized Plaintiff for not using an encrypted USB flash drive, but according to Plaintiff, Diaz refused to give him one, a claim Diaz disputed.  (D's 56.1 Stmt. Ex. 34 ¶ 5; P's Depo. at 148:15-149:11.)[9]

In January 2016, Diaz received notice of a complaint from another UPS employee regarding a new UPS customer who had a "very poor first experience with UPS during her Campus Ship training."  (D's 56.1 Stmt. Ex. 35; *see* P's 56.1 & Resp. ¶ 47.)  According to the customer, Plaintiff arrived forty-five minutes late without calling her.  (P's 56.1 & Resp. ¶ 47.) The customer complained about Plaintiff's knowledge and ability, and "felt like [her] entire afternoon was wasted."  (*Id.* (internal quotation marks omitted).)  Plaintiff admitted that he had not been effective in helping the customer and apologized to the UPS employee that had notified Diaz.  (*Id.*)

Plaintiff received the rating "significant improvement needed" for his score of 0.45 on his year-end evaluation for 2015.  (P's 56.1 & Resp. ¶ 49; *see* D's 56.1 Stmt. Ex. 37 at UPS618.) Diaz provided the same comment from his 2014 evaluation:

> [Plaintiff] needs significant improvement in all aspects of his job responsibilities. His lack of Technical proficiency affects all the BSC goals set for the year and affects the group's performance as well.  [Plaintiff] has been spoken to several times throughout the year regarding his performance and it has yet to improve.

(P's 56.1 & Resp. ¶ 49; *see* D's 56.1 Stmt. Ex. 32 at UPS596 (comment from 2014 evaluation).) Plaintiff contends that the evaluation did not accurately reflect his responsibilities or his performance.  (P's 56.1 & Resp. ¶ 49.)  On or about March 17, 2016, Diaz and Frey met with Plaintiff to discuss this evaluation, and Diaz provided Plaintiff with documentation concerning Plaintiff's alleged performance deficiencies.  (*Id.*; Frey Depo at 72:12-73:4.)  Plaintiff told Diaz

---

[9] Plaintiff was using a non-encrypted USB flash drive that Falconer gave to him.  (P's Depo. at 148:15-149:11.)

and Frey that he was being treated unfairly, denied training and supplies, and being held to a different standard. (P's Aff. ¶ 8.)

A memorandum signed by Diaz and dated April 29, 2016 lists a number of incidents from January 2016 through April 2016 where Plaintiff purportedly failed to follow procedures and instructions or caused a "communication failure." (D's 56.1 Stmt. Ex. 36.) Plaintiff contends that the document is replete with exaggerations and examples of disparate treatment. (P's 56.1 & Resp. ¶ 48.)

**F.      Termination of Plaintiff's Employment**

Defendant terminated Plaintiff's employment on June 1, 2016 because he was deemed a "significant improvement needed employee for 2014 and 2015," an external customer reported unsatisfactory performance at the job site, and, despite multiple interventions and opportunities for improvement, Plaintiff "failed to grasp basic concepts needed to perform at an acceptable level." (D's 56.1 Stmt. Ex. 39.)[10]

**G.      Plaintiff's Complaints Regarding Diaz and Related Facts**

In September 2013, Plaintiff complained to Frey about Diaz's management style, noting that Diaz blew every mistake out of proportion. (D's 56.1 Stmt. Ex. 40 at Assue-1.) Plaintiff also wondered if Diaz targeted him because of his "easy going personality" or because he was

---

[10] The parties do not agree on who decided to terminate Plaintiff. (*See* P's 56.1 & Resp. ¶¶ 51-52.) After the March 2016 performance review meeting, Frey sent a form containing Plaintiff's evaluation scores to human resources. (Frey Depo. at 73:16-74:2.) Then there were discussions between Frey, Diaz, and Henry Vaca, the human resources ("HR") operations manager for the North Atlantic District, about the lack of improvement in Plaintiff's performance. (*See id.* at 74:3-20; Sussman Aff. Ex. 7 ("Vaca Depo") at 4:14-16.) At some point in 2016, Diaz verbally recommended the termination of Plaintiff's employment to Frey. (Diaz Depo. at 58:14-59:21.)

Vaca recalled meeting with Frey regarding Plaintiff at least twice in 2016, once in January and once in May, and he did not recall meeting with Diaz during that time. (Vaca Depo. at 53:24-54:16.) According to Vaca, Frey decided to terminate Plaintiff. (*Id.* at 53:18-20.) But Frey could not have fired Plaintiff without Vaca's input. (*Id.* at 54:23-56:3.) Frey testified that he did not remember when he met with Vaca, (Frey Depo. at 76:3-6), but he recalled at some point Vaca told him that HR approved of terminating Plaintiff, (*id.* at 75:2-11).

the junior person in the northern buildings.  (*Id.*)  He did not mention race or attribute Diaz's conduct to racial animus.  (*Id.*)

In May 2014, Plaintiff called the UPS Help Line to complain again about Diaz.  (D's 56.1 Stmt. Ex. 41 at UPS638 (noting initial phone call on May 1, 2014).)  Plaintiff complained that Diaz was acting "derogatorily" toward him and two other employees:  Lawrence, who, as noted above is Black, and Felicia E., who is Hispanic.  (P's 56.1 & Resp. ¶ 56.)[11]  Plaintiff complained that Diaz gave them negative feedback and criticism and threatened Plaintiff with dismissal if he failed to improve his performance.  (D's 56.1 Stmt. Ex. 41 at UPS638-39.)  Plaintiff did not mention race or attribute Diaz's conduct to racial animus.  (P's 56.1 & Resp. ¶ 56.)

Vaca investigated Plaintiff's concerns in June 2014.  (*Id.* ¶ 57.)  Vaca spoke to Plaintiff, Frey, Diaz, Lawrence, and Felicia E. as part of his investigation.  (*Id.*)  Based on his interviews, Vaca concluded that Diaz was a fair supervisor, but his approach toward Plaintiff could be "perceived as hostile."  (*Id.* ¶ 58 (internal quotation marks omitted).)  Accordingly, Vaca instructed Diaz to be more cognizant of the tone and content of his feedback in order to help Plaintiff improve his performance.  (*Id.*)  Diaz agreed to meet regularly with Plaintiff in the future to discuss his performance, (*id.*), but apparently these meetings did not occur, (P's Aff. ¶ 5).

On an unspecified date, but sometime prior to February 25, 2015, Plaintiff filed a complaint with the EEOC against "UPS – 43rd Street."  (*See* D's 56.1 Stmt. Ex. 43 at Assue-629; P's Depo. at 210:19-24.)  By letter dated February 25, 2015, the EEOC informed Plaintiff that his complaint was unperfected but that the respondent had been notified of the complaint.

---

[11] It is not clear from the record how to spell Felicia E.'s last name.  It appears as "Escavara" in Plaintiff's deposition transcript, (P's Depo. at 49:1); "Ecchevara" in Diaz's deposition transcript, (Diaz Depo. at 53:8); and "Escharre (spelling unknown)" in one of Plaintiff's internal complaints, (D's 56.1 Stmt. Ex. 41 at UPS636).

(D's 56.1 Stmt. Ex. 43 at Assue-629.)  Plaintiff never spoke to Diaz, Frey, Vaca, or anyone in management at UPS about this EEOC complaint.  (P's 56.1 & Resp. ¶ 61.)  But Plaintiff thinks Diaz was aware of the complaint because he noticed Diaz "became very docile" in a discussion with him about a week or two after submitting the complaint.  (P's Depo. at 213:1-8.)[12]

On or about August 31, 2015, Plaintiff filed another complaint with UPS, which was referred to a corporate workforce manager.  (P's 56.1 & Resp. ¶ 60; *see* D's 56.1 Stmt. Ex. 42.) Plaintiff complained that Diaz engaged in "condescending and demotivating speech and actions" when dealing with him and other technicians.  (P's 56.1 & Resp. ¶ 60 (internal quotation marks omitted).)  Plaintiff did not mention race in his complaint.  (*Id.*)  Plaintiff also complained that when he brought his concerns to Frey and Vaca, they did not take them seriously.  (*Id.*)  Michelle Hug, an employee in UPS's human resources office for the east region, investigated the complaint and met with Plaintiff, Vaca, and Frey.  (*Id.*)  She concluded that there were no valid grounds for Plaintiff's complaint and reported the same to Plaintiff.  (*Id.*)

TSG supervisors like Diaz typically supervise seven to ten technicians.  (Frey Depo. at 20:7-12.)  During Plaintiff's employment, Diaz supervised five Black technicians:  Plaintiff, Lawrence, King, Scott, and Eugene Murray.  (P's 56.1 & Resp. ¶ 71.)  Diaz gave one of the Black technicians the highest overall performance evaluation among all of the technicians that reported to Diaz.  (*Id.* ¶ 72.)  Diaz also provided another Black technician with positive performance evaluations.  (*Id.*)  Plaintiff admits that Diaz did not target other Black technicians. (*Id.* ¶ 68.)  Diaz never used any racial epithets or called Plaintiff any inappropriate names.  (*Id.* ¶ 65.)  Diaz never said anything to Plaintiff – and Plaintiff never overheard Diaz say anything to

_____

[12] Because the date of the EEOC complaint is unclear, it is unknown if Diaz's change in tone also coincided with Vaca's instruction that Diaz be gentler in providing feedback to Plaintiff.

anyone else – that made Plaintiff think that Diaz was prejudiced or biased against Black people. (*Id.* ¶¶ 63, 64.)[13]

When asked at his deposition who he thought did not receive as much work or was somehow treated more favorably than him, Plaintiff named Martinez. (P's Depo. at 177:1-4.) There was no follow-up as to Plaintiff's basis for naming Martinez, and Plaintiff noted that they worked different shifts. (*Id.* at 177:4.) Plaintiff also said that Scott, a Black technician, received less work than he did. (*Id.* at 177:5-11.) Later in his deposition, Plaintiff said that based on what he heard from other technicians, all of the technicians – Black, Hispanic, Asian-American, and White – received more favorable treatment than he. (*Id.* at 177:23-178:6; *see* P's 56.1 Stmt & Resp. ¶ 67.) Plaintiff also recalled only one incident where he observed Diaz acting inappropriately or unfairly manner toward a technician other than himself; that technician was Martinez. (P's 56.1 & Resp. ¶ 69.)

In his affidavit, Plaintiff provides examples of what he perceived to be discriminatory treatment. (*See generally* P's Aff.) He claims that Diaz overassigned him work. (*Id.* ¶ 6.) Diaz also prevented Plaintiff from staying at work late, and without a work-issued laptop, Plaintiff could not complete certain tasks outside of the office. (*Id.*) Plaintiff also claimed to have "observed" Diaz delay completion times "for less busy Hispanic technicians like Roberto Martinez and Franklin Eccheveria," but Diaz never did the same for Plaintiff. (*Id.* ¶ 7.)

## H. Procedural History

On September 29, 2016, Plaintiff filed the complaint in this action, alleging employment discrimination and retaliation claims under 42 U.S.C. § 1981 ("Section 1981"), N.Y. Executive

---

[13] Frey never said anything to Plaintiff that made Plaintiff think that Frey was biased against him because of his race. (*Id.* ¶ 70.)

Law § 296 ("NYSHRL"), and New York City Human Rights Law ("NYCHRL").  (Doc. 1

("Compl.").)  Defendant answered on December 1, 2016, (Doc. 11), and the parties proceeded to

discovery.  Defendant filed the instant motion, (Doc. 25), following discovery.

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*

On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant bears the

initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied,

the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element

of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support

of the [non-movant's] position will be insufficient; there must be evidence on which the jury

could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-

movant "must do more than simply show that there is some metaphysical doubt as to the material

facts,"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he

"may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed.*

*Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)-(3).

## III. <u>DISCUSSION</u>

### A. *McDonnell Douglas* **Framework**

Plaintiff asserts claims of discrimination and retaliation under Section 1981. Discrimination and retaliation claims under that statute are analyzed pursuant to the burden-shifting framework established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 807 (1973). *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 315 (2d Cir. 2015) ("Retaliation claims under . . . § 1981 are . . . analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework.") (footnote omitted); *Ruiz v. Cty. of Rockland*, 609 F.3d

486, 491 (2d Cir. 2010) ("[C]laims for race . . . discrimination under Section[] 1981 . . . are

analyzed under the burden-shifting framework set forth in *McDonnell Douglas* . . . .").

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of

establishing a *prima facie* case of discrimination or retaliation. *See Weinstock v. Columbia

Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). At the *prima facie* stage, the burden of proof is minimal.

*See id.* To make out a *prima facie* case of discrimination, a plaintiff must show that, "(1) he

belongs to a protected group; (2) he was qualified for his position; (3) his employer took an

adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an

inference of race discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir.

2014) (*per curiam*). To make out a *prima facie* case of retaliation, a plaintiff must establish that

(1) he was engaged in activity protected under an anti-discrimination statute; (2) the employer

was aware of the plaintiff's participation in the protected activity; (3) the employer took adverse

action against the plaintiff; and (4) there is a causal connection between the plaintiff's protected

activity and the adverse action. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720

(2d Cir. 2010).

Once the plaintiff makes a *prima facie* showing of discrimination or retaliation, a

rebuttable presumption of discrimination or retaliation arises and the burden of production shifts

to the defendant "to articulate a legitimate, non-discriminatory [or non-retaliatory] reason" for

the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.

2000); *see Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) ("This showing creates a

'presumption of retaliation,' which the defendant may rebut by 'articulat[ing] a legitimate, non-

retaliatory reason for the adverse employment action.'") (alteration in original) (quoting *Jute v.

Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). "[T]he defendant must clearly

set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination [or retaliation] was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis and first alteration in original) (internal quotation marks omitted).

If the defendant proffers a legitimate, nondiscriminatory or nonretaliatory reason for the challenged employment action, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination or retaliation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Chen*, 805 F.3d at 70. The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory [or non-retaliatory] reasons proffered by the defendant were false, and that more likely than not discrimination [or retaliation] was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (alterations and internal quotation marks omitted). "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination [or retaliation].'" *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination [or retaliation]." *Id.* The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated or retaliated. *See Reeves*, 530 U.S. at 143.

## B. Discrimination Claim Under Section 1981

Plaintiff alleges that because of his race he experienced "inferior terms and conditions of employment" and was terminated. (Compl. ¶ 37; *see id.* ¶ 38.) His opposition memorandum specified the inferior terms and conditions: he was not assigned to shadow an experienced technician; he was not provided a work-issued laptop or an encrypted USB flash drive; he

received unfavorable assignments; and he received negative evaluations for specious reasons. (Doc. 33 ("P's Opp.") at 2-6.)  Defendant asserts that Plaintiff cannot make out a *prima facie* case of discrimination because he cannot establish the adverse employment action or inference of discrimination elements.  (Doc. 26 ("D's Mem.") at 3-9; Doc. 29 ("D's Reply") at 2-8.) Defendant further argues that even if Plaintiff can demonstrate a *prima facie* case, there was a legitimate, nondiscriminatory reason for its conduct, and Plaintiff cannot establish that that reason was a pretext for discrimination.  (*See* D's Mem. at 9-14.)  The Court will address each alleged employment action and, if necessary, Defendant's reason for taking such action and whether that reason was a pretext for discrimination.

1.   Termination

a.   *Adverse Employment Action*

"[A]n adverse employment action [i]s a 'materially adverse change' in the terms and conditions of employment."  *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).  "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (internal quotation marks omitted).

Defendant does not dispute that terminating Plaintiff's employment constitutes an adverse employment action.[14]  Along with Plaintiff's termination, the Court will consider the negative performance evaluations because Defendant contends it terminated Plaintiff as a result of those evaluations, (*see* D's 56.1 Stmt. Ex. 39).  *See Weber v. City of N.Y.*, 973 F. Supp. 2d 227, 251 (E.D.N.Y. 2013) ("Plaintiff's unsatisfactory performance evaluations which led to the

---

[14] A termination of employment is "deemed sufficiently disadvantageous to constitute an adverse employment action."  *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted).

initiation of . . . charges culminating in the suspension of Plaintiff qualify as adverse employment actions since Plaintiff suffered a materially adverse change in the terms and conditions of employment . . . that was more disruptive than a mere inconvenience or an alteration of job responsibilities.") (alterations and internal quotation marks omitted) (collecting cases); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) ("A negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action.").[15]

b.  *Inference of Discrimination*

The inference-of-discrimination "element is a 'flexible one that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  An inference of discrimination can be drawn from several circumstances, including:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).  But "a plaintiff's 'mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim.'" *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (quoting *Gue v. Suleiman*, No. 10-CV-8958, 2012 WL 4473283, at *8

---

[15] Negative evaluations standing alone, however, do not constitute adverse employment actions.  *See, e.g.*, *Mira v. Argus Media*, No. 15-CV-9990, 2017 WL 1184302, at *4 n.5 (S.D.N.Y. Mar. 29, 2017); *Siddiqi*, 572 F. Supp. 2d at 367-68.

(S.D.N.Y. Sept. 27, 2012)).  Additionally, "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable."  *Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014) (internal quotation marks omitted).

A common way a plaintiff can raise an inference of discrimination is "by showing that [his] employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).  A plaintiff must identify similarly situated employees, or comparators, whose situations have a high degree of similarity to his own.  *See Berube v. Great Atl. & Pac. Tea Co.*, 348 F. App'x 684, 686 (2d Cir. 2009) (summary order) (comparator "must be similarly situated in all material respects"); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001) (same). Showing similarity "in all material respects" requires that the plaintiff and the comparator were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct."  *Graham*, 230 F.3d at 40.  "The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," meaning a plaintiff's and his comparator's conduct must be "of comparable seriousness." *Id*.

Plaintiff identifies one comparator – Franklin Echeverria, a junior technician who is Hispanic.  (P's Opp. at 9-10.)  Diaz testified that Echeverria remains employed with UPS and has served more than ten years as a junior technician because he has yet to "master[] the skills necessary to become a senior technician."  (Diaz Depo. at 53:21-54:5.)  Plaintiff appears to argue for an inference of discrimination by contending Echeverria was not proficient, yet somehow he kept his job while Plaintiff did not.

Echeverria's failure to become a senior technician, however, says nothing of his proficiency with regard to the skills necessary to perform as a *junior* technician. Plaintiff offers no evidence for the proposition that one who lacks the skills necessary to be a senior technician is therefore also ill-suited to be a junior technician. Furthermore, in response to Plaintiff's point that Echeverria is a proper comparator, Defendant offered Echeverria's performance appraisals from 2014 and 2015. (*See* Doc. 30 Ex. A.) In 2014, Echeverria received scores of 0.77 and 0.84 on his evaluations, (*id.* at 2), while Plaintiff received scores of 0.36 and 0.12, (D's 56.1 Stmt. Ex. 32 at UPS595). In 2015, Echeverria received scores of 0.88 and 0.94 on his evaluations, (Doc. 30 Ex. A at 9), while Plaintiff received scores of 0.46 and 0.45, (D's 56.1 Stmt. Ex. 37 at UPS618). On all four evaluations, Echeverria received the rating "improvement needed," (Doc. 30 Ex. A at 2, 9), while Plaintiff received the rating "significant improvement needed," (D's 56.1 Stmt. Ex. 32 at UPS595; D's 56.1 Stmt. Ex. 37 at UPS618). Thus, while Plaintiff and Echeverria may have both fallen short of the "fully acceptable performer" standard, Plaintiff's and Echeverria's levels of underperformance were not of comparable seriousness, as Plaintiff's performance was substantially worse than Echeverria's.

Plaintiff would have a stronger argument if he were to point to another employee who, like him, received the "significant improvement needed" rating for two years and still kept his or her job, (D's 56.1 Stmt. Ex. 39), but he does not. Plaintiff also failed to offer evidence of customer complaints against Echeverria. Without evidence that Plaintiff and Echeverria were similarly situated in terms of performance, no reasonable jury could conclude that Echeverria is a proper comparator. *See Shepherd v. BCBG Max Azria Grp., Inc.*, No. 11-CV-7634, 2012 WL 4832883, at *19 (S.D.N.Y. Oct. 11, 2012) (alleged comparator not similarly situated to plaintiff where numerous written complaints about plaintiff revealed continuing and ongoing performance

issues that remained uncorrected, while alleged comparator had only two isolated instances of misconduct), *adopted sub nom. Shepherd v. BCBG Max Azria*, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006) ("When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment.") (collecting cases).

Furthermore, Plaintiff's disagreement with Diaz's evaluations does not create an inference of discrimination. *See, e.g.*, *Yeger v. Inst. of Culinary Educ., Inc.*, No. 14-CV-8202, 2017 WL 377936, at *11 (S.D.N.Y. Jan. 25, 2017) ("[A]n employee's general disagreement with a supervisor's evaluation of the employee's job performance, by itself, does not create an inference of discrimination or constitute proof of pretext."); *Cruse v. G & J USA Publ'g*, 96 F. Supp. 2d 320, 330 n.9 (S.D.N.Y. 2000) ("An employee's opinion that a performance review was unfair supported by only h[is] own conclusory statements to that effect, cannot bootstrap h[is] claims into a Title VII claim of discrimination.") (internal quotation marks omitted). And Diaz providing other Black technicians with positive performance evaluations, (P's 56.1 Stmt. and Resp. ¶ 72), undermines Plaintiff's argument that Diaz gave him low ratings because of his race. *See Moore*, 2013 WL 3968748, at *10 ("Plaintiff's argument that his [adverse employment action] was a result of racial or national origin animus would be discredited because his alleged comparators . . . are of the same race and national origin as Plaintiff and neither [experienced the adverse employment action].") (collecting cases).

Plaintiff also attempts to raise an inference of discrimination by pointing to his purportedly unfair assignments and the denial of a work-issue laptop and encrypted USB flash

drive.[16]  Any such inference is undermined by the fact that individuals outside of Plaintiff's protected class (such as Martinez, who did not have a laptop) were treated similarly, and individuals within his protected class (such as Scott, who allegedly received less work) were treated better.  (P's Depo. at 177:1-20, 210:8-15.)  Plaintiff's opinion that these actions were racially motivated is insufficient.  *See Moore*, 2013 WL 3968748, at *6 ("[A] plaintiff's mere subjective belief that he was discriminated against . . . does not sustain a . . . discrimination claim.") (internal quotation marks omitted).  Plaintiff offers an affidavit from Michelle Lawrence, (Doc. 35), and while she corroborates Plaintiff's claims that Diaz treated him differently, her belief that Diaz acted with racial animus is nothing more than speculation and her personal opinion, which are insufficient.  *See Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *23 n.15 (S.D.N.Y. Mar. 26, 2009) (affidavit of another employee that "consists largely of conclusory allegations and personal opinions" insufficient to raise a reasonable inference of discrimination), *aff'd*, 376 F. App'x 127 (2d Cir. 2010) (summary order); *Divers v. Metro. Jewish Health Sys.*, No. 06-CV-6704, 2009 WL 103703, at *17 (E.D.N.Y. Jan. 14, 2009) (same), *aff'd*, 383 F. App'x 34 (2d Cir. 2010); *Moore v. N.Y.S. Div. of Parole*, No. 06-CV-1973, 2008 WL 4394677, at *10 (E.D.N.Y. Sept. 23, 2008) (same).

Moreover, Diaz acted harshly or inappropriately toward Felicia E. and Martinez.  (P's 56.1 Stmt. and Resp. ¶¶ 56, 69; *see* P's Depo. at 210:8-15.)  Diaz's hostile behavior toward Hispanic technicians suggests that he was an "equal opportunity" offender.  *Casalino v. N.Y.S. Catholic Health Plan, Inc.*, No. 09-CV-2583, 2012 WL 1079943, at *8 (S.D.N.Y. Mar. 30, 2012); *see Jerram v. Cornwall Cent. Sch. Dist.*, No. 08-CV-1025, 2011 WL 13176093, at *3 (S.D.N.Y. Feb. 1, 2011) (dismissing hostile work environment claim where evidence showed

---

[16] Whether these allegations amount to adverse employment actions will be addressed below.

that supervisor was an "equal opportunity offender"), *aff'd*, 464 F. App'x 13 (2d Cir. 2012) (summary order).

Beyond Plaintiff's and Lawrence's subjective beliefs, the record is devoid of evidence that Plaintiff experienced discrimination because of his race. Diaz never used any racial epithets or called Plaintiff any inappropriate names. (P's 56.1 Stmt. and Resp. ¶ 65.) Diaz never said anything to Plaintiff – and Plaintiff never overheard Diaz say anything to anyone else – that made Plaintiff think that Diaz was prejudiced or biased against Black people. (*Id.* ¶¶ 63, 64.) *See, e.g.*, *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) ("If, as plaintiffs contend, the defendants exaggerated or lied about plaintiffs' behavior, the record does not support a finding that they did so to mask race discrimination. No comment or statement made by the defendants had any racial content or overtone."); *Alexidor v. Donahoe*, No. 11-CV-9113, 2017 WL 880879, at *6 (S.D.N.Y. Mar. 2, 2017) (dismissing discrimination claim where plaintiff, among other things, failed to provide evidence of discriminatory comments by supervisors or co-workers directed at plaintiff or others in her protected groups).

In sum, Plaintiff seems to rely on the fallacy that because he belongs to a protected class, it is reasonable to conclude that anything negative that happened to him at work was because of his membership in that class. *Cf. Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race.") (alterations and internal quotation marks omitted); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong

to a protected class") (internal quotation marks omitted); *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient.").

Thus, Plaintiff has failed to meet even his minimal burden of establishing a *prima facie* case.

c.     *Defendant's Legitimate, Nondiscriminatory Reason and Pretext*

Even if Plaintiff had succeeded at the first stage of the *McDonnell Douglas* test, Defendant has provided a legitimate, nondiscriminatory reason for terminating Plaintiff: his unsatisfactory performance. *See, e.g.*, *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (failure to "perform satisfactorily" is legitimate, nondiscriminatory reason for dismissal); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 591 (S.D.N.Y. 2013) ("Poor work performance always constitutes a legitimate and nondiscriminatory reason[] for terminating employment.") (alterations and internal quotation marks omitted); *Ashton v. Pall Corp.*, 32 F. Supp. 2d 82, 90 (E.D.N.Y. 1999) (defendant articulated legitimate, nondiscriminatory reason for termination where defendant offered "two years of negative performance evaluations combined with memoranda and discussions warning of the perils of persistent deficient performance"). As Plaintiff's termination report indicates, Defendant's stated reason for terminating Plaintiff was that he was rated "significant improvement needed" on his 2014 and 2015 evaluations. (D's 56.1 Stmt. Ex. 39.) The report also refers to a customer complaint from January 2016, (*id.*), presumably the complaint from the new UPS customer who "felt like [her] entire afternoon was wasted." (P's 56.1 & Resp. ¶ 47 (internal quotation marks omitted).) An unsatisfactory customer evaluation is another legitimate, nondiscriminatory reason for termination. *See Joseph*

*v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 313 (E.D.N.Y. 2014) ("Customer complaints have been recognized as a legitimate and nondiscriminatory reason to terminate an employee.") (collecting cases), *aff'd*, 594 F. App'x 29 (2d Cir. 2015) (summary order).

Plaintiff cannot carry his burden to demonstrate that Defendant's reason is a pretext for discrimination. "Only where an employer's business decision is so implausible as to call into question its genuineness should [a c]ourt conclude that a reasonable trier of fact could find that it is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (summary order). Plaintiff argues that Diaz fabricated his negative evaluations and they only demonstrate Diaz's discriminatory animus, not Plaintiff's incompetence. (*See* P's Opp. at 17-19.) Defendant responds that it was not just Diaz that observed Plaintiff's deficiencies and to support this point, Defendant offers examples of other supervisors criticizing Plaintiff's performance. (*See* D's Mem. at 12-13.)

Both parties cherry-pick the record to make their points.[17] But the record on the whole is clear that Plaintiff had performance issues throughout his employment. A reasonable factfinder could conclude that Falconer took a bit of a risk with hiring Plaintiff full-time, but went through with it because he appreciated Plaintiff's work ethic. (*See* D's 56.1 Stmt. Exs. 15, 16.) After Plaintiff stepped into a full-time position, his performance improved, but there were still flare-ups, as indicated by the write-ups in 2013 and comments in Plaintiff's evaluations. Things got worse after Plaintiff began reporting to Diaz, who was less supportive than Falconer, and began working primarily as an external technician, a role for which he was ill-equipped. But this is not

---

[17] For example, Defendant suggests that Plaintiff underperformed in 2012 because he received lower ratings in certain categories on his 2012 evaluation than he did on his 2011 evaluation, but Defendant ignores the increase in Plaintiff's overall score across those evaluations. (*See* P's 56.1 Stmt & Resp. ¶¶ 25, 26.) Plaintiff overlooks the three write-ups from early 2013 in characterizing himself as a strong performer in the first half of 2013. (*See* P's Opp. at 3.)

a situation where an employee who is doing fine suddenly starts receiving negative evaluations out of the blue. Even if it were, that would not show pretext. *Johnson v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 314, 324 (E.D.N.Y. 2014) (collecting cases), *aff'd*, 633 F. App'x 42 (2d Cir. 2016) (summary order). "[A] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations." *Beers v. NYNEX Material Enters. Co.*, No. 88-CV-305, 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992); *see id.* ("[P]laintiff fails to take into account that he was performing a different job for a different manager.").

But even if Defendant wrongly put Plaintiff in a position without proper support and wrongly fired him for not meeting company standards, antidiscrimination laws are not to "be used as a vehicle for second-guessing an employer's business judgment." *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) (internal quotation marks omitted). "The employer is permitted to make bad business judgments and misjudge the work of employees as long as its evaluations and decisions are not made for prohibited discriminatory reasons such as race or gender." *Id.* (internal quotation marks omitted). And even if Diaz exaggerated some of Plaintiff's shortcomings because he was hell-bent on getting rid of Plaintiff, Plaintiff cannot meet his burden of showing pretext "without some other indicia of discrimination at play." *Hawkins v. City of N.Y.*, No. 99-CV-11704, 2005 WL 1861855, at *10 (S.D.N.Y. Aug. 4, 2005) (collecting cases); *see Lizardo*, 270 F.3d at 104 ("If, as plaintiffs contend, the defendants exaggerated or lied about plaintiffs' behavior, the record does not support a finding that they did so to mask race discrimination."); *Risco v. McHugh*, 868 F. Supp. 2d 75, 104 (S.D.N.Y. 2012) ("Even if [supervisor] did exaggerate or lie about [plaintiff's] conduct or performance, there is no evidence in the record to support a finding

that he did so in order to conceal any prohibited motivation based on [plaintiff's] race or color."). No such indicia exists in this record.[18]

While Plaintiff's burden at the first *McDonnell Douglas* stage is minimal, *see Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 380-81 (2d Cir. 2001), to survive summary judgment at the third stage, Plaintiff must present not just some evidence, but sufficient evidence that Defendant's stated nondiscriminatory reason was false and a cover-up for discrimination, *see Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996). Plaintiff has failed to do so for the same reasons that his evidence does not create a triable issue as to inference of discrimination. As a result, Plaintiff's discrimination claim based on his termination is dismissed.

### 2. Lack of Training

Plaintiff contends that he received inferior training – specifically, he was not assigned to shadow a more experienced technician. (P's Opp. at 2; *see* P's Aff. ¶ 2.) A plaintiff seeking to establish that the denial of training opportunities constitutes an adverse employment action must establish two things: (1) "the employer offered training to other employees and that he was denied training under circumstances giving rise to an inference of discrimination," *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 349 (S.D.N.Y. 2010); and (2) the training "bears on either plaintiff's opportunities for professional growth and career advancement

---

[18] Defendant also contends that the so-called "same actor inference" is applicable here because Plaintiff would not have been hired without Diaz's approval, or, at the very least, Diaz interviewed Plaintiff and recommended hiring him. (*See* D's Mem. at 11-12.) Defendant has offered no evidence that Diaz actually *recommended* hiring Plaintiff, so the Court will not apply the inference.

or directly on plaintiff's compensation," *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (alterations and internal quotation marks omitted).

According to Plaintiff, it was "custom and practice" for a new hire to shadow an experienced technician. (P's Opp. at 2.) But Plaintiff offers only one example of a new hire shadowing an experienced technician for the first month of his employment, which occurred right before Plaintiff was hired. (P's Aff. ¶ 2.) He offers no other details as to why he could not shadow an experienced technician while the other new hire could. He also testified at his deposition that nobody ever denied his request for additional training. (P's Depo. at 44:18-23.) But even if the Court assumes that Defendant denied Plaintiff the opportunity to shadow an experienced technician, Plaintiff provides no evidence that a month of shadowing at the start of his job would have had any effect on the performance deficiencies that led to his discharge years later. Further, any such denial did not occur in circumstances giving rise to an inference of discrimination, for the reasons discussed above.[19] Indeed, Plaintiff does not even suggest who might be responsible for any such denial. Thus, to the extent Plaintiff's discrimination claim is based on the denial of training opportunities, that claim is dismissed.

### 3. Unfavorable Assignments

Plaintiff makes three arguments relating to unfair assignments: (1) he received "many more calls than several Hispanic junior technicians who had longer terms with the company"; (2)

---

[19] Plaintiff admitted that in addition to the structured training, he received additional training by contacting other technicians and asking for assistance, and some of them were helpful. (P's 56.1 Stmt & Resp. ¶ 16; P's Depo. at 38:2-22.) He also received computer-based training. (P's Depo. at 44:6-17; P's Aff. ¶ 3.) And after Plaintiff's 2012 appraisal, Falconer arranged for Plaintiff to contact two other technicians for additional assistance with "new features." (*See* P's Depo. at 85:16-86:19.) Thus, it is not as if Plaintiff did not receive training. "The mere fact that Plaintiff did not receive the training that he wanted, when he wanted it, does not raise an inference of discrimination." *Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 588 (S.D.N.Y. 2012). But even if Plaintiff received training that was subpar compared to the training of other technicians, the technicians that received better training included Murray, Scott, and King, all of whom are Black. (P's Depo. at 171:17-172:1.) Accordingly, it cannot be said that Plaintiff received certain types of training, but not other types, because of his race.

a "Hispanic hired slightly before [P]laintiff" received "far easier assignments"; and (3) "two other Hispanics . . . often did not complete their assignments with no adverse consequences." (P's Opp. at 3.) Plaintiff provides no record citations to support his arguments, but the Court assumes that he is referring to his claims that Diaz overassigned him work, (P's Aff. ¶ 6), and Diaz overrode completion times for Hispanic technicians, but he never did the same for Plaintiff, (*id.* ¶ 7). It is not clear whether Plaintiff intends to bolster his own assessment of his performance by showing that his assignments had a higher degree of difficulty than other employees' assignments, or if he intends to assert another adverse employment action. Assuming it is the latter, Plaintiff's claim that Diaz overassigned him work is conclusory, as he makes no attempt to identify the average amount of work Diaz assigned to technicians, much less explain how much work Diaz assigned to him. Plaintiff's claim that he "observed [Diaz] frequently" override completion times for other technicians, (*id.*), also lacks sufficient detail. And Plaintiff offers no facts to support his claims that he received more difficult assignments than other technicians.[20] Without additional facts, Plaintiff's purportedly unfavorable assignments do not rise to the level of adverse employment action. *See Linell v. N.Y.C. Dep't of Educ.*, No. 15-CV-5085, 2018 WL 1611370, at *6 (E.D.N.Y. Mar. 30, 2018) ("[W]here assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action.") (quoting *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014). Further, for the reasons discussed above, Plaintiff fails to offer facts that show he received his assignments

---

[20] While Plaintiff named Martinez as a technician that received less work or better treatment than Plaintiff did, Plaintiff noted that they worked different shifts. (P's Depo. at 177:1-4.) It is thus unclear how Plaintiff could observe how Martinez was treated or how much work he received.

because of his race.[21]  Thus, to the extent Plaintiff brings his discrimination claim based on

unfair work assignments, that claim is dismissed.

4.   Denial of Equipment

Plaintiff claims that Diaz took away his work-issued laptop and denied him an encrypted

USB flash drive, something he did not do to any other Hispanic technician.  (P's Opp. at 5.)  But

Plaintiff fails to explain how not having such a flash drive or a work-issued laptop is "more

disruptive than a mere inconvenience" so as to constitute an adverse employment action.

*Sanders*, 361 F.3d at 755 (internal quotation marks omitted); *see Paul v. Lenox Hill Hosp.*, No.

13-CV-1566, 2016 WL 4775532, at *11 (E.D.N.Y. Jan. 15, 2016) (denial of laptop computer not

an adverse action where, without laptop, plaintiff was required to use different computer), *report

and recommendation adopted*, 2016 WL 1271034 (E.D.N.Y. Mar. 29, 2016), *appeal dismissed*,

No. 16-1300 (2d Cir. Nov. 2, 2016); *Murphy v. Suffolk Cty. Cmty. Coll.*, No. 10-CV-251, 2011

WL 5976082, at *6 (E.D.N.Y. Nov. 29, 2011) (unlikely that denial of supplies and safety

equipment, standing alone, is "sufficiently disruptive so as to constitute an adverse employment

action").  Further, Plaintiff failed to offer facts that show Diaz refused to give Plaintiff

equipment because of his race.  To the contrary, Martinez, a Hispanic technician, did not have a

work-issued laptop (though it is unclear whether Diaz prevented him from having one).  (P's

Depo. at 210:8-15.)  At the same time, Black technicians – such as Lawrence, King, and Scott –

had work-issued laptops, (*id.* at 210:3-7), and all of the technicians, aside from Plaintiff, had

---

[21] To the contrary, Plaintiff testified that Scott, a Black technician, received less work than he did.  (P's Depo. at 177:5-11.)

"flash drives given to them by the company," (*id.* at 148:18-149:24). Thus, Plaintiff's discrimination claim based on the denial of equipment is dismissed.

### C.     Retaliation Under Section 1981

Plaintiff alleges that after he submitted internal complaints about Diaz's conduct in September 2013, May 2014, and August 2015, Diaz retaliated against him by producing fabricated performance reviews to create a paper trail that would support Plaintiff's termination. (*See* P's Opp. at 22-25.) Defendant claims that those complaints are not protected activity because they did not protest statutorily prohibited discrimination. (D's Mem. at 15-16.) Defendant also argues there was no causal connection between Plaintiff's protected activity and the adverse employment action. (*Id.* at 16-18.)[22]

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other grounds as stated in Jones v. N.Y.S. Metro D.D.S.O.*, 543 F. App'x 20, 22 (2d Cir. 2013) (summary order). "[I]n order for an employee's complaints to be a 'protected activity' they must relate to an alleged violation of [antidiscrimination law], i.e., the complaints must relate to race or gender." *Taylor v. Family Residences & Essential Enters., Inc.*, No. 03-

---

[22] Plaintiff's complaint in this action suggested that his retaliation claim would be based, in part, on Diaz's conduct toward Plaintiff after he learned of the EEOC complaint. While the EEOC informed Plaintiff that the respondent (UPS – 43rd Street) had been notified of the complaint, (D's 56.1 Stmt. Ex. 43 at Assue-629), Plaintiff admitted that he never spoke to anyone in management at UPS about his EEOC complaint, (P's 56.1 & Resp. ¶ 61). He only speculated that Diaz was aware of the complaint because he noticed Diaz "became very docile" in a discussion with him about a week or two after submitting the complaint. (P's Depo. at 213:1-8.) Based on these facts, Defendant argued in its initial brief that Plaintiff could not sustain a retaliation claim based on his EEOC complaint because there was no evidence that any of the decisionmakers had any knowledge of this complaint. (*See* D's Mem. at 18.) Plaintiff's opposition did not address this argument, so the Court deems Plaintiff's retaliation claim based on his EEOC complaint to be abandoned. *See Marache v. Akzo Nobel Coatings, Inc.*, No. 08-CV-11049, 2010 WL 908467, at *15 (S.D.N.Y. Mar. 12, 2010) (claim abandoned by virtue of plaintiff's failure to address it in his opposition to defendant's summary judgment motion) (collecting cases), *adopted by* 2010 WL 3731124 (S.D.N.Y. Sept. 7, 2010); *Arias v. Nasdaq/Amex Mkt. Grp.*, No. 00-CV-9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as abandoned where plaintiff's opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment).

CV-6122, 2008 WL 268801, at *13 (E.D.N.Y. Jan. 30, 2008) (internal quotation marks omitted). "Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in [antidiscrimination law] even when race or gender was not an issue." *Id.* (internal quotation marks omitted).

All three of Plaintiff's internal communications complained about Diaz's conduct, but none of them mentioned race or attributed Diaz's conduct to racial animus. (*See* D's 56.1 Stmt. Ex. 40 (September 2013 Complaint); D's 56.1 Stmt. Ex. 41 (May 2014 Complaint); D's 56.1 Stmt. Ex. 42 (August 2015 Complaint).) Because there is no indication that Plaintiff's complaints related to any alleged racial discrimination, Defendant is entitled to summary judgment on the retaliation claim.

Even if Plaintiff had alleged a protected activity, and assuming there is sufficient causal connection to establish a *prima facie* case, he has, as discussed above, offered no evidence to suggest that Defendant's stated reason for Plaintiff's termination was a pretext for retaliation. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("[W]ithout more, . . . temporal proximity is insufficient to satisfy [Plaintiff's] burden to bring forward some evidence of pretext."). Accordingly, Plaintiff's claim for retaliation is dismissed.

### D.     State and City Law Claims

In addition to his statutory claims under federal law, Plaintiff alleges that his rights were violated under NYSHRL and NYCHRL. The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that Plaintiff's Section 1981 claims should be dismissed,

this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims. *See id.* (citing 28 U.S.C. § 1367(c)(3)).

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED. The federal claims are dismissed with prejudice and the state and city claims are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 25), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: August 13, 2018
       White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.